Mark W. Ford (UT Bar No. 10569)
MASCHOFF BRENNAN GILMORE & ISRAELSEN
1389 Center Drive, Suite 300
Park City, Utah 84098
Telephone: (435) 252-1360
Facsimile: (435) 252-1361
*mford@mabr.com*

Attorney for Defendant iFIT, Inc.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| POWERBLOCK HOLDINGS, INC., | **MOTION TO DISMISS COMPLAINT** |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| IFIT, INC., | |
| Defendant. | Case No. 1:22-cv-00132-JNP-CMR |

**TABLE OF CONTENTS**

I. INTRODUCTION ..........................................................................................................1

II. FACTUAL BACKGROUND ........................................................................................2

III. LEGAL STANDARD ....................................................................................................5

    A. Rule 12(b)(6) Motion To Dismiss For Patent Ineligibility ..............................5

    B. Subject Matter Eligibility Under 35 U.S.C. § 101 ...........................................6

IV. THE CLAIMS OF THE '771 PATENT ARE INVALID UNDER § 101 ..................7

    A. *Alice* Step 1 – the claims of the '771 Patent are directed to an abstract idea.................7

    B. *Alice* Step 2 – the claims of the '771 Patent do not recite an inventive concept. ........13

V. CONCLUSION............................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016)......................................................................................15

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
    573 U.S. 208 (2014).................................................................................................. *passim*

*Am. Axle & Mfg. v. Neapco Holdings LLC*,
    939 F.3d 1355 (Fed. Cir. 2019)......................................................................................12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................................8

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018), *cert. denied*, 140 S. Ct. 911 (2020).............................8

*CardioNet, LLC v. InfoBionic, Inc.*,
    955 F.3d 1358 (Fed. Cir. 2020)......................................................................................13

*Chamberlain Group, Inc. v. Techtronic Indus. Co.*,
    935 F.3d 1341 (Fed. Cir. 2019)................................................................................12, 14

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)........................................................................................16

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
    859 F.3d 1352 (Fed. Cir. 2017)........................................................................................8

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)........................................................................................9

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015)......................................................................................17

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017)........................................................................................9

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012)......................................................................................................9, 16

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015)................................................................................10, 17

*Realtime Data LLC v. Array Networks Inc.*,
    537 F. Supp. 3d 591 (D. Del. 2021)..................................................................................8

*RecogniCorp, LLC v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 672, 199 L. Ed. 2d
   535 (2018) ............................................................................................................10

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 2747, *reh'g denied*,
   140 S. Ct. 27 (2019) ...............................................................................................8

*In re TLI Commc'ns LLC Pat. Litig*,
   823 F.3d 607 (Fed. Cir. 2016) ..............................................................................17

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) ................................................................................9

*Univ. of Fla. Research Found., Inc. v. GE Co.*,
   916 F.3d 1363 (Fed. Cir. 2019) ..............................................................13, 15, 16

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
   887 F.3d 1376 (Fed. Cir. 2018) .........................................................................9, 15

*Yu v. Apple, Inc.*,
   1 F.4th 1040 (Fed. Cir. 2021) .........................................................................12, 13

**Rules**

Federal Rules of Civil Procedure 12 .........................................................................4, 8

**Statutes**

35 U.S.C. § 101 ............................................................................................... *passim*

Pursuant to Federal Rules of Civil Procedure 12(b)(6), Defendant iFIT, Inc. (iFIT) respectfully moves to dismiss Plaintiff PowerBlock Holdings, Inc.'s (PowerBlock's) Complaint alleging infringement of Powerblock's U.S. Patent No. 7,778,771 ('771 Patent).[1]

## I.  INTRODUCTION

The claims of the '771 Patent are directed to subject matter that is ineligible for patent protection under 35 U.S.C. § 101. Specifically, the '771 Patent is directed to an abstract idea: performing an electronic weight adjustment action on a selectorized dumbbell. Adjusting weight on selectorized dumbbells is practice that has been performed manually using dials and knobs for many years. The claims of the '771 patent simply add an electric motor and a data entry device to selectorized dumbbells to automate the process.

None of the components recited by the claims to carry out this idea are new. The claims recite only old, off-the-shelf, conventional technology to automate the adjustment of weight on selectorized dumbbells. For example, in addition to the selectorized dumbbell, the claims of the '771 Patent recite components including "a data entry device," "an electric motor," "a stand," "a controller," "data entry keys or buttons," "a visual display," and "a sensor." These components are not new or specialized and are not implemented in a unique or non-conventional manner. To the extent that efficiencies are achieved by automating the practice of adjusting weight on selectorized dumbbells, these efficiencies originate exclusively by removing actions historically performed by human operators.

If enforceable, the claims of the '771 Patent would cover a functional end-result – performing an electronic weight adjustment action on a selectorized dumbbell – in a generic and

---

[1] The '771 Patent is attached hereto as Exhibit 1.

conventional technological environment. As such, the asserted claims fail to recite patent-eligible subject matter under 35 USC § 101, as interpreted in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014) and applied by scores of decisions since.

## II. FACTUAL BACKGROUND

Generally, the '771 Patent merges two separate technologies that each existed independently of the other long before the '771 Patent. The first technology is a dumbbell having an amount of weight that can be manually adjusted by a user. The second technology is a data entry device that controls an electric motor (*e.g.*, a keypad on a soda machine). Combining these technologies, the '771 Patent sets out to reduce the amount of human interaction required to change the weight of a dumbbell by automating this process with electrical components.

Dumbbells, or hand weights, are a common piece of exercise equipment long used in weight training. The earliest forms of dumbbells (shown below) were simple; they included a set amount of weight secured to opposite ends of a handle. The amount of weight secured to a handle on the individual dumbbells could not be varied. The inability to vary the weight on a single dumbbell required users to have multiple dumbbells to change an amount of weight.



In the mid-1990s, dumbbells having an adjustable amount of weight were developed. The '771 Patent not only acknowledges that adjustable weight dumbbells (which it refers to as "selectorized dumbbells") existed, it also describes how they operate:

In a selectorized dumbbell, a plurality of weights nest together. The weights provide a stack of nested left weight plates and a stack of nested right weight plates. The left and right stacks of weight plates are separated from one another by a gap.

In a selectorized dumbbell, a handle is inserted into the gap between the left and right stacks of weight plates. A selector is then manipulated to determine how many of the left and right weight plates of the weights are coupled to the left and right ends of the handle. Once the selector is positioned to pick up a selected number of weights, the handle can then be lifted by the user from between the stacks of weight plates. The selected number of weights will rise with the handle to be used in performing various exercises with the dumbbell.

'771 Patent, 1:23-37.

The existence and operation of these selectorized dumbbells was well known to the inventors of the '771 Patent. In fact, in 1996, the same inventors that are identified on the '771 Patent filed and were awarded a (now expired) patent on a selectorized dumbbell. *Id.* at 1:41-43 ("A well known selectorized dumbbell is shown in U.S. Pat. No. 5,769,762 [(Prior Art Patent)], owned by the assignee of this invention."). Reproduced below is Figure 1 from the Prior Art Patent, which illustrates these "well known" selectorized dumbbells:



Fig. 1

Changing a weight on selectorized dumbbells requires physical interaction between a person and the dumbbell, a fact that is also acknowledged by the '771 Patent. *Id.* at 1:38-41 ("[T]he selectors used to adjust the weight of the dumbbell are mechanical members that must be directly gripped and manipulated by the user."). The '771 Patent contends, however, that manually adjusting an amount of weight on a selectorized dumbbell is not ideal because "there is always the possibility that the user might not fully or correctly engage the selector," which could lead to injury or damage to the dumbbell. *Id.* at 1:49-54. The '771 Patent asserts that this potential for human adjustment error is compounded in situations where a user wants to adjust two separate dumbbells with consistent amounts of weight. *Id.* at 1:55-67.

In addition to the existence of selectorized dumbbells, the '771 Patent also acknowledges that data entry devices were well known and commonly used. According to the '771 Patent:

> [M]any people today are quite familiar with electronic devices in which data entry is accomplished by the manipulation of an alpha-numeric keyboard or a numeric keypad or the like. Such data entry devices are found on a host of products such as personal computers, cell phones, television remote controls, etc.

*Id.* at 2:1-6. Despite how well-known and common both data entry devices and selectorized dumbbells were, the '771 Patent asserts that "no similar data entry device has been used to adjust the numbers of weights coupled to each end of the handle of a selectorized dumbbell." *Id.* at 2:6-8.[2]

In light of this perceived lack of union between selectorized dumbbells and data entry devices, the '771 Patent identifies a "need in the art" to merge these technologies in order to "automate and ease the task of adjusting the weight of selectorized dumbbells." *Id.* at 2:8-10.

---

[2] iFIT disagrees with PowerBlock's assertion. Indeed, U.S. Patent No. 6,033,350 discloses a selectorized dumbbell, a data entry device, and an electronic motor.

Figure 2 of the '771 Patent, reproduced below, illustrates the combination of a "well known" selectorized dumbbell with a "quite familiar" data entry device, which is described and claimed by the '771 Patent:



FIG. 2

### III. LEGAL STANDARD

#### A. Rule 12(b)(6) Motion To Dismiss For Patent Ineligibility

A court may grant a motion to dismiss when, accepting the well-pleaded allegations in the complaint as true, it still concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citations omitted). One issue a court may resolve at the pleading stage is patent eligibility, if it is apparent from the face of the patent that the asserted claims are patent ineligible. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018), *cert. denied*, 140 S. Ct. 911 (2020). The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017); *see also SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 2747, *reh'g denied*, 140 S. Ct. 27 (2019). "Resolving eligibility on the pleadings minimizes 'expenditure of time and money by the parties and the court' and 'protects the public' from illegitimate patents." *Realtime Data LLC v. Array Networks Inc.*, 537

F. Supp. 3d 591, 605 (D. Del. 2021) (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014)).

### B. Subject Matter Eligibility Under 35 U.S.C. § 101

In *Alice*, the Supreme Court applied the now-familiar two-step test "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 218. The inquiry distinguishes patent-eligible inventions from mental processes and abstract intellectual concepts that are not eligible for patent protection. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012).

At Step 1, courts "must first determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 573 U.S. at 217-19. That is, the Court must determine whether the claims' "focus"—their "character as a whole"—is an abstract idea. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *see also Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017) ("*IV-Erie*") ("heart" of computer-based claims was abstract idea); *Ultramercial*, 772 F.3d at 714-15 (same). An abstract idea need not be a "preexisting, fundamental truth"—instead, merely a "longstanding . . . practice" can suffice. *Alice*, 573 U.S. at 220. Thus, methods that "[h]umans have performed" are abstract ideas ineligible for patent protection. *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385 (Fed. Cir. 2018).

At Step 2, courts must determine whether the other claim elements, individually or collectively, add "significantly more" to the abstract idea that is "sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221-22. Implementing an abstract idea with "well-understood," "routine," or "conventional" activities, or in a particular technological environment, does not suffice. *Id.* at 225; *see also OIP Techs., Inc. v. Amazon.com,*

6

*Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015) ("conventional computer activities or routine data-gathering steps" are insufficient). "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 672, 199 L. Ed. 2d 535 (2018).

## IV.　THE CLAIMS OF THE '771 PATENT ARE INVALID UNDER § 101

### A.　*Alice* Step 1 – the claims of the '771 Patent are directed to an abstract idea.

The invention disclosed and claimed in the '771 Patent is not complicated. It is a simple combination of conventional, generic, off-the-shelf components that are merged to automate a practice that, for many years, has been performed manually. Prior to the '771 Patent, adjusting a weight on a selectorized dumbbell required that "selectors used to adjust the weight of the [selectorized] dumbbell . . . be directly gripped and manipulated by the user." '771 Patent, 1:39-41. To overcome alleged disadvantages associated with manual adjustments of selectorized dumbbells, the '771 Patent alleges "a need [exists] in the art to automate and ease the task of adjusting the weight of selectorized dumbbells." *Id.* at 2:8-10. Thus, the claims of the '771 Patent are directed to ***performing an electronic weight adjustment action on a selectorized dumbbell***.

The '771 Patent has 20 claims, including independent claims 1, 19, and 20. The Complaint asserts that iFIT infringes "one or more claims of the '771 Patent." Complaint (ECF No. 2) at ¶ 31. However, the only claim PowerBlock specifically identifies as infringed is claim 20. *Id.* at ¶ 32. Claim 20 recites:

> 20. A weight selection and adjustment system for a dumbbell, which comprises:
>
> (a) a dumbbell that provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell, wherein the exercise weight provided by the dumbbell is adjustable by coupling more or fewer weight plates to each end of the handle:

(b) an electric motor that may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the handle; and

(c) a data entry device to allow the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user.

'771 Patent, claim 20.

The elements of claim 20 (the dumbbell, the electric motor, and the data entry device) are all recited using functional limitations.[3] Functional claim limitations describe an invention in terms of ***what it does***, rather than its structural components or how it performs its function. For example, the dumbbell recited in claim 20 "provides an exercise weight that is lifted by a user when the user grips and lifts a handle of the dumbbell, wherein the exercise weight provided by the dumbbell is adjustable by coupling more or fewer weight plates to each end of the handle." The electric motor recited in claim 20 "may be selectively energized and when energized will cause a desired number of weight plates to be coupled to each end of the handle." The data entry device recited in claim 20 "allow[s] the user to input a weight selection decision that operatively controls the energization of the motor to adjust the exercise weight of the dumbbell in accordance with the weight selection decision input into the data entry device by the user." Each of the functions recited in the limitations of claim 20 coordinate to accomplish the task of electronically adjusting an amount of weight on a dumbbell. Thus, claim 20 is directed to performing an electronic weight adjustment action on a selectorized dumbbell.[4]

---

[3] Functional limitations are not limited to claim 20. Indeed, many of the claims of the '771 Patent include at least one functional limitation.
[4] The additional components and functions that are recited in claims 1-19 of the '771 Patent neither change nor stray from the focus of claim 20. Rather, these claims are also directed to

The idea of performing an electronic weight adjustment action on a selectorized dumbbell is an abstract idea. The fact that the claims of the '771 Patent recite this idea using structural components does not save the claims of the '771 Patent from abstractness. *Chamberlain Group, Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019) ("Without more, the mere physical nature of [patentee's] claim elements (e.g., controller, interface, and wireless data transmitter) is not enough to save the claims from abstractness[.]"). Indeed, many claims that include structural components have been found to recite abstract ideas. *See id.*; *see also Yu v. Apple, Inc.*, 1 F.4th 1040, 1044 n.2 (Fed. Cir. 2021) (stating "whether a device is 'a tangible system (in § 101 terms a machine)' is not dispositive" and holding claims directed to an "improved digital camera" and reciting "a first and a second image sensor," "an analog-to-digital converting circuitry," and "a digital image processor" unpatentable under § 101); *Am. Axle & Mfg. v. Neapco Holdings LLC,* 939 F.3d 1355 (Fed. Cir. 2019) (holding claims directed to an "a method for manufacturing a shaft assembly of a driveline system" and reciting "a hollow shaft member" and "at least one liner" unpatentable under § 101).

For patents that purport to offer technological improvements, the Federal Circuit has instructed courts to inquire whether "the claims focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic process and machinery." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020). Patents that fail to describe how an improvement is

---

performing an electronic weight adjustment action on a selectorized dumbbell. Like claim 20, the components that these claims recite – a controller (claim 2), data entry keys or buttons (claim 3), a visual display (claim 4), a stand and driver (claim 5), a sensor (claim 7), "a device configured to grip the selectorized dumbbell" (claims 8-11), and differing configurations of the above components (claims 12-18) – all coordinate to assist in performing an electronic weight adjustment action on a selectorized dumbbell.

9

accomplished and instead include claim elements recited in purely functional terms have been held to be directed to abstract ideas. *See, e.g.*, *Univ. of Fla. Research Found., Inc. v. GE Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) (finding a patent directed to an abstract idea where "[n]either the [asserted] patent, nor its claims, explains *how*" recited components operate but instead describing these components "in purely *functional* terms" (emphasis in original).).

Here, the claims of the '771 Patent do not recite any **specific** means or method for performing an electronic weight adjustment action on a selectorized dumbbell. For example, the claims do not recite any specialized hardware that is implemented in a unique or non-conventional manner to electronically adjust the weight on a selectorized dumbbell. In addition, the claims of the '771 Patent do not recite a specific way in which an electronic weight adjustment is performed on a selectorized dumbbell. Rather, similar to the claims at issue in *Univ. of Fla. Research Found.*, the claims of the '771 Patent include functional limitations that describe the recited physical components ***not by how*** they operate, but by ***what they are configured to do***. Thus, the claims of the '771 Patent merely recite the ***desired result*** of performing an electronic weight adjustment action on a selectorized dumbbell—which is the abstract idea itself.

Courts also look to whether only conventional components are described to effectuate the alleged improvement. *See, e.g.*, *Yu*, 1 F.4th at 1043-45 (holding that claims directed to an "improved digital camera" were unpatentable because the claims recited "[o]nly conventional camera components are recited to effectuate the [improvement]"). Similar to *Yu*, the claims of the '771 Patent do not recite any novel device, instrumentality, or apparatus to electronically adjust the weight on a selectorized dumbbell. Rather, the components that are recited in the claims of the '771 Patent are all well-known, generic, and conventional. The '771 Patent itself confirms

this. For example, the '771 Patent explicitly acknowledges the similarity between the selectorized dumbbells that are described and claimed in the '771 Patent and the selectorized dumbbells that are described in the much earlier Prior Art Patent (which the '771 Patent describes as "well known"). '771 Patent, 4:41-43 ("Selectorized dumbbells 4 are similar to those shown in the assignee's [Prior Art Patent.]").

The '771 Patent also admits that "many people today are quite familiar with electronic devices in which data entry is accomplished by the manipulation of an alpha-numeric keyboard or a numeric keypad or the like." *Id.* at 2:1-4. These data entry devices have long been used in connection with electric motors to automate previously manual tasks, such as opening and closing garage doors.[5] The '771 Patent describes electric motors with only a very high degree of generality and only to accomplish their ordinary function, namely "convert[ing] electric energy into the rotation of a motor drive shaft." *Id.* at 6:34-56. To ensure that the terms "motor" and "motorized" are given their broadest possible definition, the '771 Patent further states "the term 'motor' or 'motorized' is not to be limited to the specific type of motor 46 shown herein having a rotatable drive shaft 48, but is meant to apply to any powered device that converts electrical energy into physical motion[.]" *Id.* at 11:43-47. The additional components that are recited in the various dependent claims of the '771 Patent (controllers, buttons, visual displays, sensors…) are also described at a very high level and are also well known and conventional. *See, e.g.*, '771

---

[5] In a case that involved movable barriers, such as garage doors, the Federal Circuit held that the claims were directed to abstract ideas because "[t]he only described difference between the prior art movable barrier operator systems and the claimed movable barrier operator system is that the status information about the system is communicated wirelessly, in order to overcome certain undesirable disadvantages of systems using physical signal paths—additional cost, exposed wiring, and increased installation time. *Chamberlain Group, Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1346 (Fed. Cir. 2019).

11

Patent, 6:57-67 (providing a high level description of controllers, buttons, and visual displays) and 7:42-58 (providing a high level description of sensors).

In performing the Step 1 analysis, the Federal Circuit considers prior *Alice* opinions as "substantial guidance in determining whether claims are unpatentable under the 'abstract idea' rubric." *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016). Here, many analogous cases confirm that automating a process traditionally performed by humans through the use of conventional technology in a way that does not result in an improvement to the technology is an abstract idea. For example, in *Voter Verified, Inc.*, the Federal Circuit considered a patent which used a computer to verify a human voter's vote and submit that vote for tabulation. 887 F.3d 1376, 1385. The Federal Circuit concluded that the claims failed *Alice* Step 1 because they were directed to "verifying the vote[] and submitting the vote for tabulation" and that "[h]umans have performed [that] fundamental activity that forms the basis for our democracy for hundreds of years." *Id.* Like the claims in *Voter Verified, Inc.*, the claims of the '771 Patent are directed to an activity that humans have performed for many years.

Also instructive here is the Federal Circuit's decision in *Univ. of Fla. Research Found., Inc.*, which considered the validity of a patent that describes a method and system for "integrat[ing] physiologic data from at least one bedside machine." 916 F.3d at 1366. The system included a "bedside device" connected to the "bedside machines" that "convert[s] received data streams" from the bedside machines "to a format independent of any particular bedside machine." *Id.* In finding the claims directed to an abstract idea, the Federal Circuit held that the patent at issue "seeks to automate 'pen and paper methodologies' to conserve human resources and minimize errors" without explaining how the physical components perform their recited

12

functions. *Id.* at 1367-1368. The claims of the '771 Patent are directed to an abstract idea for at least these same reasons.

### B.  *Alice* Step 2 – the claims of the '771 Patent do not recite an inventive concept.

To pass step two of the *Alice* inquiry, the patent claims must contain additional elements besides those expressing the abstract idea that, when considered individually or as part of an ordered combination, constitute an "inventive concept" that "transform[s] the nature of the claim" into one that meets the requirements of § 101. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 773 (Fed. Cir. 2019) (first quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126-27 (Fed. Cir. 2018); and then quoting *Alice*, 573 U.S. at 217). There are strict limits on what these additional elements can be. They cannot be "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* (alteration in original) (quoting *Alice*, 573 U.S. at 221). Even if the additional elements are novel or non-routine, that may still be insufficient. *Id.* (citing *Ultramercial*, 772 F.3d at 715). They must amount to "significantly more" than the abstract idea. *See Mayo*, 566 U.S. at 72-73.

The '771 Patent purports to achieve several advantages over manually adjustable selectorized dumbbells. For example, the '771 Patent asserts that by automating the adjustment of selectorized dumbbells, "the possibility that the user might not fully or correctly engage the selector" can be avoided and weight adjustments on multiple dumbbells may be accomplished simultaneously. '771 Patent, 1:49-67. Even assuming that these assertions are true, similar to the claims in *Univ. of Fla. Research Found.*, these purported improvements originate ***exclusively*** with the removal of human operators, and are achieved via the abstract idea. Relying on conventional technology to "perform routine tasks more quickly or more accurately is insufficient to render a patent claim eligible." *OIP Technologies*, 788 F. 3d at 1370.

The physical components recited by the claims of the '771 Patent are merely "conduits for the abstract idea" and, as such, do not save the claims. *See, e.g.*, *In re TLI Commc'ns LLC Pat. Litig*, 823 F.3d 607, 612 (Fed. Cir. 2016) (concluding that the claimed tangible components were merely "conduits for the abstract idea" partly because "[t]he specification failed to provide any technical details for the tangible components, but instead predominately describe[d] the system and methods in purely functional terms"). For example, in cases where automation using computers results in improved efficiency, the Federal Circuit has held that "improved speed or efficiency inherent with applying the abstract idea on a computer" cannot supply an inventive concept. *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).

Because the electronic components that are recited in the claims of the '771 Patent are generic elements that are routine, well-known, conventional, or well-understood and because any advantages gained by practicing the '771 Patent originate with the removal of human operators, the claims of the '771 Patent fail step two of *Alice*.

## V. CONCLUSION

The Complaint fails to state a claim for infringement of patent-eligible claims. iFIT therefore respectfully requests that the Court dismiss PowerBlock's Complaint in its entirety for failure to state a claim upon which relief can be granted.

| | |
|---|---|
| December 16, 2022 | MASCHOFF BRENNAN GILMORE & ISRAELSEN, PLLC |
| | /s/ *Mark W. Ford* |
| | *Attorney for Defendant iFIT, Inc.* |